Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1477 | **DATE** | 7/24/2002 |
| **CASE TITLE** | Polish American Congress vs. City of Chicago, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 8/12/02 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. In summary, Chicago's Rule 12(b)(1) motion is granted as to Non-resident Plaintiffs Dolores Bajda, Anne Janiga and Virginia Wielgos and denied as to the Resident Plaintiffs and Polish American Congress. Its Rule 12(b)(6) motion is denied as to Complaint Count I and is granted as to Counts II and III. Chicago is ordered to answer Count I on or before August 5, 2002 and a status hearing is set at 9 a.m. August 12, 2002. (9-1, 10-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 2 5 2002 | |
| | Notified counsel by telephone. | | date docketed | 23 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | 7/24/2002 | |
| | | 02 JUL 24 PM 3:39 | date mailed notice | |
| SN | courtroom deputy's initials | Date/time received in central Clerk's Office | SN mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| POLISH AMERICAN CONGRESS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 02 C 1477 |
| ) | |
| CITY OF CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

DOCKETED
JUL 2 5 2002

MEMORANDUM OPINION AND ORDER

Polish American Congress and seven individuals (collectively "Plaintiffs") bring this action for declaratory and injunctive relief against (1) City of Chicago, (2) Richard F. Mell in his official capacity as Chairman of the Chicago City Council Committee on Committees, Rules and Ethics, (3) Chicago's Board of Election Commissioners and (4) Langdon D. Neal, in his official capacity as Chairman of Chicago's Board of Election Commissioners (for convenience, defendants are collectively referred to as "Chicago," treated as a singular noun).[1] Plaintiffs allege that Chicago's ward redistricting map adopted in December 2001 violates their rights under the First,[2] Fourteenth and Fifteenth

---

[1] Plaintiffs have voluntarily dismissed claims against Richard M. Daley, in his official capacity as Chicago's Mayor, and the Chicago City Council.

[2] As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guarantees).

Amendments and under the Voting Rights Act of 1965 ("Act," 42 U.S.C. §§1973 to 1973p).[3]

Chicago has filed a motion to dismiss Plaintiffs' entire claim under Fed. R. Civ. P. ("Rule") 12(b)(1) and 12(b)(6). For the reasons stated in this memorandum opinion and order, Chicago's motion is granted in part and denied in part.

## Applicable Legal Standards

When considering a motion to dismiss, a court must accept all of the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in plaintiff's favor (Johnson v. Rivera, 272 F.3d 519, 520 (7th Cir. 2001)). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" (Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

When as here a Rule 12(b)(1) motion challenges the substance (and not the sufficiency) of a complaint's jurisdictional allegations, the court may entertain affidavits and other competent evidence, weighing any conflicts (Capitol Leasing Co. v. FDIC, 999 F.2d 188, 191 (7th Cir. 1993)(per curiam)). In that respect plaintiffs have the burden of supporting their jurisdictional assertions by competent proof. By contrast, a

---

[3] Citations to the Act will take the form "Section --," omitting the Title 42 reference.

2

Rule 12(b)(6) motion restricts the parties and court to the contents of the complaint itself.[4]

Facts

Every ten years the United States Census Bureau conducts a national census. Under Illinois law the Chicago City Council is authorized to redistrict Chicago's 50 wards[5] by ordinance one year after each census (65 ILCS 20/21-22).

In late 2001 the City Council began to consider ward redistricting plans based on the results of the 2000 census. On November 28 it announced a proposed redistricting map that incorporated suggestions made by members of the Council's African-American and Latino caucuses (¶¶22-23). Members of those caucuses were primarily motivated to maximize the number of Chicago's majority-minority wards (¶23). That proposed map did not take into account census information about voting age population or ancestry, because those figures were not yet available (¶24).[6] At a December 14 public hearing three

---

[4] What follows in the Facts section is therefore drawn from the Complaint (cited simply "¶ "). Hence the recital omits "Plaintiffs allege" or any comparable locution, although this Court has not of course made any findings or even expressed any views on the allegations (as the caption Facts might otherwise suggest). Chicago's initial memorandum is cited as "C. Mem. --" and its reply memorandum as "C. R. Mem. --," while Plaintiffs' submission is cited as "P. Mem. -."

[5] Each Chicago ward elects one alderman to the City Council.

[6] P. Mem. Ex. E is an excerpt from the since-released year 2000 census figures, listing Chicago's Polish ancestry population as 210,421.

3

different citizen groups--including a Polish ethnic coalition--presented alternative redistricting plans, none of which was seriously considered by Chicago (¶25). On December 19 the City Council adopted new ward redistricting ordinances based on the November 28 map (¶26).

This action concerns northwest Chicago's 30th Ward, which under the redistricting ordinance surrounds the 31st Ward on three sides and at points is as narrow as two city blocks (¶¶28, 32). Year 2000 census figures show the population of northwest Chicago to be 55% Latino, while at the time of the 1990 census that area was also home to 184,614 people (but see n.6) of single and multiple Polish ancestry (¶29).[7] Many members of the Polish ethnic community do not speak, or have a limited understanding of, the English language (¶35).

Polish American Congress is a not-for-profit corporation that represents the interests of Polish-Americans by promoting civic, educational and cultural programs (¶5). Each of the seven individual plaintiffs is a registered voter who either previously resided or now resides in the 30th Ward (¶¶6-12). Six of the seven individuals are of Polish or combined Polish-German

---

[7] Because the Complaint is silent both (1) as to the concept of "northwest Chicago," as well as how that relates to the ward areas at issue, and (2) as to how much of the total Polish ancestry population represented by the 184,614 figure or the 210,421 figure lived or lives in that area, ¶29 seems to compare an undefined apple with an undefined orange.

4

ethnicity (id.). In addition, plaintiff Michael Wojcik ("Wojcik") is the current 30th Ward alderman and sues in both his personal and his official capacity (¶12). Plaintiffs claim to represent the Polish community of interest for the purposes of this action (¶13).

Plaintiffs oppose the new redistricting map as it relates to the 30th Ward because the new ward boundaries splinter the Polish ethnic community of interest, previously contained in two wards, into four different wards (¶¶28, 31). According to Plaintiffs, Chicago designed the new ward boundaries for the sole purpose of creating a Latino majority in the 30th Ward (¶34). That focus on race injures the Polish community of interest by minimizing the representation of that community's needs on the City Council (id.). Other harms inflicted on the community by redistricting include (1) the removal of certain churches and businesses from the 30th Ward, (2) potential cuts to certain ward services (including Polish-language translation) and (3) the difficulty that Wojcik will face in being re-elected and thereby representing the Polish community's interests in the City Council (¶¶37-40). Plaintiffs have produced an alternative map establishing boundaries for the 30th Ward that they believe will redress those injuries (¶41), and they now request declaratory and injunctive relief.

## Jurisdiction

Chicago first argues that this Court has no jurisdiction to hear this action under Rule 12(b)(1) because Plaintiffs lack standing and the claims are unripe. To establish standing, plaintiffs must generally show (1) that they have suffered an injury in fact, (2) that there is a causal connection between that injury and the challenged conduct and (3) that it is likely--as opposed to merely speculative--that the injury will be redressed by a favorable decision (Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

But United States v. Hays, 515 U.S. 737, 744-45 (1995) (citation omitted) teaches a variation on that standing requirement that is specific to legislative redistricting challenges based on equal protection principles:

> Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action. Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

In literal terms that means that *every* voter in a racially gerrymandered district has suffered an injury in fact because the

6

use of racial criteria in structuring the district has impermissibly skewed the political process. All voters are entitled instead to have the forces of political competition operate independently of an artificially-created and racially-based distortion of a district's makeup. That being true, it must be recognized (as neither Plaintiffs nor Chicago appear to realize) that Plaintiffs' Polish ethnicity is really irrelevant to the issue of their standing to challenge the redistricting.[8]

That being said, this opinion turns to the standing question in light of Hays. That decision calls for the application of different tests for standing, depending on where Plaintiffs live. Plaintiffs who reside within the boundaries of the redrawn 30th Ward--in this case Frank Golinski, Robert Kocabinski, Mary Taylor-Hart and Wojcik[9] ("Resident Plaintiffs")--have standing if their pleading adequately asserts that the district is "racially gerrymandered." And although nothing in the parties' submissions

---

[8] It is worth noting that the same principle could well rise up to haunt Plaintiffs' action in substantive terms. Although ethnicity does not equate to race, it might seem to trigger the Hays rationale if the map that Plaintiffs propose were to equate to an ethnically gerrymandered district--and if so, the same analysis that allows some Plaintiffs into the federal courts on standing grounds could drive Plaintiffs out of court on the merits. That however is for the future--for now, once the standing question is resolved in favor of at least some Plaintiffs, only the substantive viability of Plaintiffs' action in Hishon terms is at issue.

[9] Wojcik's standing arises solely out of his individual capacity as a resident of the 30th Ward, not from his official capacity as the ward's current Alderman.

7

contains specific information on this score, it would seem certain that at least some of Polish American Congress' members live in that redrawn ward--so its representative standing vel non depends on the same analysis.

Determining whether a legislative district has been racially gerrymandered--that is, whether its boundaries have been set with a primary purpose of distinguishing between voters on the basis of race--can be difficult (Shaw v. Reno, 509 U.S. 630, 646 (1993)). At this stage the Resident Plaintiffs and Polish American Congress need only to have included well-pleaded allegations from which it may reasonably be inferred that the 30th Ward boundaries "rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification" (id. at 649). To that end the Complaint includes allegations:

    1. that the redistricting map adopted by Chicago was based on maps drawn up by the African-America and Latino caucuses in the City Council, and that those caucuses were "primarily motivated to maximize the number of majority-minority wards in the City" (¶23);

    2. that the boundaries of the wards in northwest Chicago were drawn "with the specific purpose" of creating eleven Latino-majority wards (¶30); and

8

    3. that the "bizarre" shape of the 30th Ward can be explained only on the basis of the residents' race or ethnic origin (¶32).

Together those allegations sufficiently state a claim of racial gerrymandering and provide Resident Plaintiffs and Polish American Congress with standing (see Shaw, 509 U.S. at 649).

  On the other hand, all other Plaintiffs--Dolores Bajda, Anne Janiga and Virginia Wielgos ("Non-resident Plaintiffs")--must make a different kind of showing that they have suffered harm (the "injury in fact" prong of the Lujan test) to establish standing.[10] That they have failed to do.

  Non-resident Plaintiffs' asserted injuries stem from the harms that they claim the 30th Ward redistricting has inflicted on the "Polish ethnic community of interest," which they of course claim to represent. Yet they have failed to allege any judicially cognizable harms. Despite the Complaint's characterization of a geographically and culturally cohesive Polish community of interest (¶33), most of Chicago's Polish-American residents--even most of those residents living in northwest Chicago--did not reside within the former boundaries of the 30th Ward (¶¶29, 31).[11] Nothing in the Complaint explains

---

  [10] Additionally, of course, they would have to meet the other two prongs of the Lujan test to establish standing.

  [11] Under the ward redistricting plan adopted in 1991, each ward had approximately 55,675 residents (see Barnett v. Chicago, 969 F. Supp. 1359, 1371 (N.D. Ill. 1997)). If 184,614 Polish-

9

how the Polish-Americans who happen to have lived in the former
30th Ward constitute a cohesive community of interest distinct
from any broader community of interest that might be shared by
all of Chicago's Polish-American residents.

And even if the Non-resident Plaintiffs had appropriately
asserted the existence of a clearly-defined Polish ethnic
community of interest contained within the previous boundaries of
the 30th Ward (as they have not), the harms they claim that
community suffered as a result of the redistricting are simply
not judicially cognizable injuries. No injury stems from the
fact that certain churches or businesses fall outside of the new
30th Ward boundaries: There is obviously no requirement that
political boundaries must track the boundaries of other
institutions,[12] and just as obviously there is no impediment to
residents crossing ward boundaries to attend religious services
or to go shopping, or to aldermen leaving their wards to appear
at institutions located elsewhere. Similarly, any concern about
the quality of city services that residents of different wards
might receive fails to rise to the level of an injury because (1)

---

Americans had been concentrated in "northwest Chicago" (an
undefined concept--see n.7) at the time of the 1990 census, they
could have filled well over three entire wards. In reality the
Polish-American population was much more widely dispersed than
that: According to 1990 census figures, only 39% of the 30th
Ward residents claimed Polish ancestry.

[12] And as C. R. Mem. 7 suggests, any attempt to draw
political boundaries that coincide with church congregational
boundaries would raise serious Establishment Clause problems.

10

it is entirely speculative and therefore unripe (see <u>Hinrichs v. Whitburn</u>, 975 F.2d 1329, 1333 (7th Cir. 1992)) and (2) the entitlement to city services extends to all residents equally and does not itself create a particular community of interest that is specially injured by any failure to provide such services.

Finally, Non-resident Plaintiffs' claim that the Polish community's interests will cease to be represented in the City Council as a result of the redistricting of the 30th Ward is also fatally flawed. That proposition is inherently troublesome, because it proceeds from the premise that our elected representatives necessarily and slavishly vote (and otherwise act) in accordance with their ethnic origins, no matter how many generations they and their forebears may have lived in this country. <u>Shaw</u>, one of the very cases to which Plaintiffs look as a ticket of entry to the federal court, explains the offensiveness of that notion in terms of racially-based reapportionment that could equally be said as to ethnically-based reapportionment (509 U.S. at 647-48 (citations omitted)):

> Put differently, we believe that reapportionment is one area in which appearances do matter. A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid. It reinforces the perception that members of the same racial group--regardless of their age, education, economic status, or the community in which they live--think alike, share the same political interests, and will prefer the same

11

candidates at the polls. We have rejected such
perceptions elsewhere as impermissible racial
stereotypes. By perpetuating such notions, a racial
gerrymander may exacerbate the very patterns of racial
bloc voting that majority-minority districting is
sometimes said to counteract.

The message that such districting sends to elected
representatives is equally pernicious. When a district
obviously is created solely to effectuate the perceived
common interests of one racial group, elected officials
are more likely to believe that their primary
obligation is to represent only the members of that
group, rather than their constituency as a whole. This
is altogether antithetical to our system of
representative democracy.

But even apart from such a problematic (and offensive) assumption, Plaintiffs' claim relies on a further chain of speculative and interdependent assumptions: (1) that Wojcik would certainly lose any reelection bid he would launch in the new 30th Ward,[13] (2) that any candidate who might defeat Wojcik would not be Polish-American, (3) that Wojcik would assuredly be reelected if Plaintiffs' own proposed boundaries for the 30th Ward were adopted and (4) that no other alderman, whether elected in the 30th Ward or in any other ward, could possibly represent the needs of the Polish-American community adequately.[14] Again such speculation about what might possibly occur (even apart from

---

[13] C. R. Mem. 6 points out that when Wojcik was last reelected (in 1999) the population of the 30th Ward was nearly 50% Latino and only about 20% Polish-American. Apparently the voting population can exercise more independent and unbiased judgment than Plaintiffs are willing to credit to their elected representatives.

[14] At least four other current alderman are of Polish or Polish-German ancestry (C. Exs. 4-7).

12

the assumptions' dubious underpinning, at odds as they are with principles of representative democracy) falls far short of establishing an injury in fact for purposes of standing to bring a federal action.[15]

This action is therefore dismissed as to Non-resident Plaintiffs. But because Resident Plaintiffs and Polish American Congress do have standing, this opinion turns next to Chicago's Rule 12(b)(6) challenges to the particular claims advanced in the Complaint.

## Equal Protection

Count I alleges that the ward redistricting process violated Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment because race--and more specifically a desire to create Latino-majority wards--was the predominant factor in Chicago's determination of the 30th Ward boundaries. To support that Plaintiffs point to the Complaint's allegations that the redistricting process and the Ward's ultimate shape demonstrate that Chicago's primary goal was to ensure that the 30th Ward had a Latino majority.

---

[15] P. Mem. 9 claims that Plaintiffs need not provide evidentiary support for their assertion of jurisdiction, erroneously citing to two cases that deal only with Rule 12(b)(6) motions to dismiss (Palda v. General Dynamics Corp., 47 F.3d 872, 874 (7th Cir. 1995) and Early v. Bankers Life & Cas. Co., 959 F.2d 75, 79 (7th Cir. 1992)). As stated earlier, Rule 12(b)(1) differs in that respect: It places the burden on Plaintiffs to support their assertion of jurisdiction with competent proof, even at this threshold stage of the litigation.

13

Chicago's arguments in favor of dismissing that Count are unconvincing. And more than one reason calls for the rejection of Chicago's position.

First, C. Mem. 9 asserts that the new shape of the 30th Ward was "obviously determined" by its prior shape. But even a brief comparison of the former ward boundaries with the new ward boundaries demonstrates that the ward's new shape was far from "obvious" before redistricting.

To summarize that comparison, the 30th Ward previously comprised two main sections joined by a connecting corridor approximately four city blocks wide, with the entire ward being situated to the immediate north and west of the 31st Ward (Complaint Ex. C). Now the 30th Ward consists of three main sections, joined by two connecting corridors that are two or three blocks wide and that surround the 31st Ward on its west, north and east sides (Complaint Ex. A). That is a significant alteration, and the resulting shape is irregular enough (shades of Elbridge Gerry!) to defeat Chicago's assertion--at least at this stage of the litigation--that the ward's present boundaries are merely the obvious outcome of its historical shape.

Second, C. Mem. 10 urges this Court to label as a mere "conclusory allegation" the Complaint's assertion that race was the predominant factor in drawing the 30th Ward boundaries. To be sure, a complaint can be dismissed if it contains conclusions

14

so vague that defendant has not been provided with adequate notice of plaintiff's claim and the grounds on which it rests (see, e.g., Kyle v. Morton High Sch., 144 F.3d 448, 454-57 (7th Cir. 1998)(per curiam)). But this case surely does not fit that description. Plaintiffs have not simply advanced a broad and unsupported conclusion that race played a role in the redistricting. They have also included at ¶¶23-34 specific allegations about how race--and particularly how a singular focus on the creation of a Latino-majority ward--figured into the redistricting process. To require greater specificity at this point would effectively hold Plaintiffs to a heightened fact-pleading standard inconsistent with the Rules' notice pleading system (see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S. Ct. 992, 998 (2002); Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69 (1993)).

In sum, the Complaint adequately states a claim that the equal protection rights of Resident Plaintiffs, and of the members of Polish American Congress who live in the 30th Ward, were violated when Chicago used race as the predominant factor in the determination of that Ward's boundaries. Chicago's motion to dismiss Count I is therefore denied.

## Voting Rights

Count II of the Complaint alleges a violation of Plaintiffs' voting rights under both the Act and the Fifteenth Amendment.

Neither of those theories states a cognizable claim.

As for the Act, on its face it does not support Plaintiffs' claim. Plaintiffs argue that their rights have been violated because the Act prohibits discrimination against any "language minority group" (Section 1973b(f)(2)), but they have obviously missed the related provision of Section 1973l(c)(3) that expressly limits "language minority group" to "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." Expressio unius est exclusio alterius--persons of Polish heritage are not covered. That torpedoes Plaintiffs' claim of a violation of the Act.

Plaintiffs' advancement of a claimed Fifteenth Amendment violation fares no better. They argue that the new ward boundaries violated their constitutional rights under that Amendment by unfairly diluting the Polish-American community's voting power--but the Supreme Court has never found vote dilution claims cognizable under the Fifteenth Amendment (see <u>Reno v. Bossier Parish Sch. Bd.</u>, 528 U.S. 320, 334 n.3 (2000), citing <u>Mobile v. Bolden</u>, 446 U.S. 55, 65 (1980) and <u>Voinovich v. Quilter</u>, 507 U.S. 146, 159 (1993)). Instead the Fifteenth Amendment has been successfully invoked only by plaintiffs who allege government interference with their abilities to register to vote or to cast ballots in elections because of their race or color (see, e.g., <u>Rice v. Cayetano</u>, 528 U.S. 495 (2000)).

16

Because Plaintiffs have made no such allegation here, they have also failed to state a claim for a violation of their Fifteenth Amendment rights. Count II is therefore dismissed in its entirety.

## Freedom of Association

Finally, Wojcik alone claims a violation of his First Amendment rights. To that end he contends that the new ward boundaries deny him the right to meaningful participation in the aldermanic election by forcing him to seek votes from non-Polish-American residents of the 30th Ward and by "eliminating his ability to expressively associate with those individuals who would vote for him in order to express and advance his political views" (P. Mem. 16).

Quite apart from the manner in which such a mindset is at odds with the principles of representative democracy articulated in the earlier quotation from Shaw, there is no support for such a claim of a First Amendment violation. While the First Amendment does guarantee citizens the right to freedom of association for the purpose of expressing their political views, nowhere does that Amendment guarantee that citizens will be politically successful or effective (see Washington v. Finlay, 664 F.2d 913, 927-28 (4th Cir. 1981)). Wojcik has not said that the redistricting imposes any impediment on his ability to have his name placed on the ballot and to run a serious campaign for

17

reelection as alderman by appealing to <u>all</u> of his constituents for support. Count III is also dismissed for failure to state a claim.[16]

## Conclusion

In summary, Chicago's Rule 12(b)(1) motion is granted as to Non-resident Plaintiffs Dolores Bajda, Anne Janiga and Virginia Wielgos and denied as to the Resident Plaintiffs and Polish American Congress. Its Rule 12(b)(6) motion is denied as to Complaint Count I and is granted as to Counts II and III. Chicago is ordered to answer Count I on or before August 5, 2002, and a status hearing is set at 9 a.m. August 12, 2002.[17]

_____
Milton I. Shadur
Senior United States District Judge

Date: July 24, 2002

---

[16] P. Mem. 16 also argues that Wojcik has suffered a separate violation of his Equal Protection rights under the Fourteenth Amendment, but nothing in Count III asserts anything other than a violation of his First Amendment rights (via the Fourteenth Amendment) to freedom of expression and association. That argument is therefore disregarded.

[17] On a collateral subject, it appears clear from Chicago's vigorous presentation on the current issues (as this Court had anticipated) that there is no reason to fear that the interests of its Latino residents will not be fully and adequately (indeed, aggressively) represented by the present defendants. That being the case, this Court contemplates denying the previously deferred motion for intervention by Dixon Negron (who is represented by the able counsel for Mexican American Legal Defense and Education Fund) at that next status hearing, unless his counsel can then assert a convincing reason for granting that motion.

18